IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CASSIDY ALMQUIST,

                Plaintiff,

                v.

SYNERGO, LLC, an Oregon limited liability
company, SYNERGO, an Oregon corporation;
ASSOCIATION FOR CHALLENGE COURSE
TECHNOLOGY, a Delaware non-profit
corporation,

                Defendants.

Case No. 3:15-cv-01281-SB

**FINDINGS AND
RECOMMENDATION**

---

**BECKERMAN, Magistrate Judge.**

      Cassidy Almquist ("Almquist") filed an Amended Complaint against Synergo, LLC, an

Oregon limited liability company, Synergo, an Oregon corporation (collectively "Synergo"), and the

Association for Challenge Course Technology, a Delaware non-profit corporation ("ACCT"),

alleging two claims for negligence. Almquist's action arises from an accident at the Bar-M-Ranch,

Page 1 - FINDINGS AND RECOMMENDATION

in which she fell from a Giant Swing and was paralyzed. Almquist alleges that Synergo breached its duty to act as a reasonable challenge course inspector when it failed to direct or recommend that the Giant Swing close until operators of the swing were properly trained. (Am. Compl. ¶ 29.) Almquist alleges that ACCT was negligent in promulgating national standards for its certified inspectors which do not require that inspectors recommend equipment be closed if the operators of the equipment are not properly trained and remain closed until the operators receive proper training. (Am. Compl. ¶¶ 16-18, 26, 29-30.)

Synergo and ACCT filed motions for summary judgment. For the reasons set forth below, the district judge should grant the summary judgment motions.

## BACKGROUND

The Cavalry Church ("Church") has operated the Bar-M-Ranch since acquiring the property in January 2012. (Jennifer L. Crow Decl. Ex. 1 (Steven Whinery Dep. 17:24-25, Apr. 28, 2016 (hereinafter "Whinery Dep.")), June 28, 2016.) The Church purchased the Bar-M-Ranch with the intention of turning the property into a church camp. (Crow Decl. Ex. 2 (Matthew Kessie Dep. 64:16-20, Apr. 28, 2016 (hereinafter "Kessie Dep.")).) In 2012, the Church decided to construct a Giant Swing at the Bar-M-Ranch property. (Kessie Dep. 62:3-7.) The head pastor of the Church, Steven Whinery ("Whinery"), appointed Matthew Kessie ("Kessie"), the associate pastor, to manage the design and construction of the Giant Swing. (Kessie Dep.79:5-8.) Previously, Kessie worked at the Columbia Park Challenge Course ("CPCC"), a local ropes course for groups to use in team building exercises. (Kessie Dep. 32:12-33:3.) Kessie's prior experience included working as a course manager and facilitator, during which time he received training from a company called Project Adventure. (Kessie Dep. 44:18-24.) The CPCC hired third parties to perform inspections to ensure

that its course was safe. (Kessie Dep. 39:13-19.) While working at CPCC, Kessie met Chris Vowels ("Vowels"). (Kessie Dep. 33:12-15.)

After Whinery asked Kessie to oversee the Giant Swing project, Kessie contacted individuals from his prior challenge course experience, including Vowels, who was working for Synergo. (Kessie Dep. 78:16-25; Crow Decl. Ex. 3 (Christopher Vowels Dep. 5:20-22, Apr. 12, 2016 (hereinafter "Vowels Dep.")).) Synergo is in the business of, among other things, inspecting challenge courses. (Am. Compl. ¶ 8.) Synergo is located in Tigard, Oregon, and is a Professional Vendor Member ("PVM") of ACCT.[1] Synergo conducts inspections of challenge courses according to ACCT standards. (Am. Compl. ¶ 28.)

Vowels volunteered to assist the Church in the design and construction of the Giant Swing. (Kessie Dep. 87:7-9, 26:10-15.) It was clear to both Kessie and Whinery that Vowels was acting as a volunteer only, and he was not working in his capacity as a Synergo employee. (Kessie Dep. 27:9-12, 28:11-15 ("Synergo had no part–had no connection whatsoever with the installation, the building of anything with the swing.").) Vowels received no compensation relating to the design and construction of the Giant Swing (Kessie Dep. 19:17-20; Whinery Dep. 9:23-10:4), nor was there a promise or agreement that Synergo would be hired to perform inspections of the Giant Swing in exchange for Vowels volunteering his time. (Kessie Dep. 121:23-122:3, 123:5-10 ("[T]here was no promise or anything like that, any sort of advertisement or anything like that, to say Synergo would

---

[1] According to ACCT, "[a] PVM of ACCT is a company which has successfully completed the Professional Vendor Member Application, including the Accreditation, process. The process includes a stringent review which determines an applicant's adherence to ACCT Accreditation Policies and Procedures and its good faith commitment to ACCT Standards. Successful completion of this process distinguishes a PVM from other vendors, identifying the PVM as having been found to be highly experienced and competent." http://www.acctinfo.org/?PVMList (last visited Dec. 27, 2016).

be involved if Chris did this work . . . .").) In fact, during discussions regarding post-construction inspections, Vowels provided Kessie the name of a course inspector in Seattle who could perform the inspection. (Vowels Dep. 96:10-20.) Construction of the Giant Swing was completed in February or March of 2012, and the Giant Swing was put into use for the 2012 camp season. (Whinery Dep. 21:7-15; Kessie Dep. 99:15-21.)

After the course was constructed, Kessie hired Synergo in June 2012 to inspect "the physical elements of the course to make sure it was safe." (Kessie Dep. 63:12-16, 125:4-5, 165:10-166:1.) In Kessie's experience, course inspections were done to inspect the safety of the equipment. (Kessie Dep. 110:14-20.) Specifically, Kessie testified:

> Q:    So it was a structural inspection. Is that a fair way to put it?
>
> A:    Yeah. That's what we always did, yeah, a structural inspection.
>
> Q:    It's meant to look at the elements and materials of the course, and that's it?
>
> A:    Right.

(Kessie Dep. 164:19-25.) Kessie was aware that the sole purpose of Synergo's inspection was to ensure the integrity of the structural elements and the equipment. Kessie was clear that Synergo had not been hired to observe or train the facilitators of the Giant Swing. (Kessie Dep. 175:16-176:4 ("I did not hire that.").)

Chandler Sheets ("Sheets") performed the 2012 inspection on behalf of Synergo. (Kessie Dep. 62:25-63:8.) During the inspection, Sheets inspected the equipment and elements and "made sure that everything was connected and the wires were in good condition." (Kessie Dep. 160:3-7.) During the 2012 inspection, Sheets recommended that the camp develop a challenge course manual. (Kessie Dep. 110:21-25.) However, Kessie testified that at the time, he "wasn't even really thinking

that way because I was thinking about the inspection . . . for the course." (Kessie Dep. 110:21-25.) In reviewing the 2012 inspection report, Kessie confirmed that the report expressly provides that Synergo did not inspect how the camp runs the element, or the training of facilitators. (Kessie Dep. 175:13-25.) Specifically, the 2012 inspection report states that Synergo inspects "Course Construction/Design," "Current Course Condition," and "Equipment," but that it does not inspect, among other things, "Facilitation techniques." (Erik Marter Decl. Ex. 1 at 1-2, June 17, 2016.) In addition, the inspection report instructs that facilitators should be properly trained. (Marter Decl. Ex. 1 at 2-3.) Kessie acknowledged that Synergo was hired to "inspect the safety of the equipment and the course" and not to inspect the Bar-M-Ranch's facilitation techniques. (Kessie Dep. 175:13-176:4, 183:20-23.) Despite Synergo's recommendation for staff training in the 2012 inspection report, the Bar-M-Ranch elected not to do so at that time. (Kessie Dep. 195:6-14.)

During the 2012 summer camp, Kessie served as the facilitator for the Giant Swing. (Kessie Dep. 112:23-24.) However, when individuals associated with the Church expressed an interest in facilitating, Kessie made an announcement at the Church. (Kessie Dep. 128:14-22.) After the 2012 summer camp, Kessie held training sessions for approximately ten individuals to learn how to assist with the Giant Swing. (Kessie Dep.129:2-9.) Prior to the training sessions, Kessie did not talk to anyone regarding the content of the training because he was uncertain "what direction that we were going." (Kessie Dep. 131:17-21.) Kessie was aware that if he wanted a facilitation inspection, he could have hired someone to perform that work. (Kessie Dep. 176:6-8, 180:14-15 ("If I wanted to hire [training], I could.").) Kessie testified, however, that he did not seek any assistance and he felt "comfortable" running the facilitator training. (Kessie Dep. 130:8-15.) Kessie did not rely on any written materials to assist with the training. (Kessie Dep. 212:1-25.) Specifically, Kessie did not

review ACCT's website or refer to any material prepared by ACCT to inform the training. (Kessie Dep. 212:1-25.) The training sessions included Kessie watching the participants to determine if they were capable of operating the Giant Swing without assistance and, from those observations, Kessie compiled a list of qualified people to act as facilitators. (Kessie Dep. 140:12-24.)

In 2013, Vowels, who was still employed by Synergo, inspected the Bar-M-Ranch course. (Kessie Dep. 188:21-24.) The inspection was performed in the same manner as the 2012 inspection, i.e., an inspection of the elements and equipment, and not the facilitation. (Kessie Dep. 189:3-8; Vowels Dep. 47:7-13.) Like its 2012 predecessor, the 2013 inspection report explains that Synergo did not evaluate course facilitation techniques. (Marter Decl. Ex. 2 at 2.) Following the inspection, Vowels spoke with Kessie about developing a course manual. (Kessie Dep. 190:21-191:2.) After the 2013 inspection, and prior to Almquist's accident, Kessie contacted Synergo regarding developing a training manual. (Kessie Dep. 111:6-16.) Kessie was aware that in 2012 he could have called Synergo to request assistance with developing a training manual, but he delayed until the Church made a decision about whether the course would be used strictly for amusement purposes or for adventure-based learning. (Kessie Dep. 111:19-24.)

The fact that Synergo was certified by ACCT was not a consideration when the Bar-M-Ranch hired Synergo to conduct the 2012 and 2013 inspections. (Kessie Dep. 327:11-21; Whinery Dep. 118:11-24.) While Kessie was generally aware of ACCT, it was his understanding that ACCT set standards for construction of adventure courses. (Kessie Dep.161:16-20, 162:10-12.) Similarly, Whinery was also generally aware of ACCT, and it was his understanding that ACCT set voluntary standards and recommendations. (Whinery Dep. 113:20-115:6.) Neither Kessie nor Whinery had

contact with anyone from ACCT for any reason relating to the construction of the Giant Swing or the training of facilitators. (Kessie Dep. 299:12-18; Whinery Depo. 118:11-16.)

The equipment required to operate the Giant Swing was stored in a locked box, next to the Giant Swing. (Kessie Dep. 118:21-19:1, 148:16-18.) The keys to the locked box were kept on a hook in the Bar-M-Ranch pantry, an unsecured location. (Kessie Dep. 119:14-18.) In hindsight, Kessie acknowledges the keys should have been kept by the camp director or otherwise secured. (Kessie Dep. 119:21-25.)

During the week of Almquist's accident, Kessie's approved Giant Swing facilitators were scheduled to arrive at camp on Tuesday. (Kessie Dep. 16:15-19, 23:15-22.) However, on Monday, Robin Tidrick ("Tidrick"), the Bar-M-Ranch camp director, and the camp counselors wanted to demonstrate the Giant Swing. (Kessie Dep. 16:15-19.) Camp personnel held a meeting with the volunteers who were present at the camp and, at that time, Tidrick realized that Kessie's trained facilitators would not arrive until the following day. (Crow Decl. Ex. 4 (Robin Tidrick Dep. 32:16-33:2, 34:6-16, Apr. 13, 2016 (hereinafter "Tidrick Dep.)).) Camp personnel nevertheless selected a volunteer, Tyler Floren ("Floren"), who they believed could operate the Giant Swing. (Kessie Dep. 16:20-23; Crow Decl. Ex. 5.) Floren was at the camp that week to volunteer as a part of a work crew (washing dishes, cooking, etc.). (Kessie Dep.223:7-17.) Although Floren had started facilitator training with Kessie, Floren did not successfully complete the training. Kessie had never approved Floren as a facilitator for the Giant Swing. (Kessie Dep. 19:5-7, 135:24-136:25, 215:7-11.) Tidrick did not contact Kessie to inquire whether Floren was qualified to operate the Giant Swing. (Tidrick Dep. 28:20-25.) Tidrick asked and allowed Floren to operate the Giant Swing without Kessie's knowledge or authorization. (Kessie Dep. 17:18-21.)

Page 7 - FINDINGS AND RECOMMENDATION

At the same camp volunteer meeting, Almquist volunteered and was selected to be the participant to demonstrate the Giant Swing. (Tidrick Dep. 37:9-13.) Almquist and Floren went out to the site of the Giant Swing to set up. (Tidrick Dep. 38:5-8.) Tidrick did not observe Floren operate the Giant Swing, but she heard over her radio that there had been an accident. (Tidrick Dep. 39:23-40:1.) Almquist fell from the Giant Swing because Floren secured her to the Giant Swing backward, as confirmed by Floren after the accident. (Kessie Dep. 250:11-15, 257:20-25; Crow Decl. Ex. 5.)

Kessie was aware that the Giant Swing should be operated only by properly trained facilitators. (Kessie Dep. 180:19-181:24.) Kessie was frustrated to learn of the accident, particularly after he specifically told camp personnel that his authorized facilitators would not arrive until Tuesday. (Kessie Dep. 18:2-12, 335:15-336:12.) Kessie testified that "[l]ooking back on this accident, people did things without permission[,] . . . so it wouldn't matter if there was a manual or not [because p]eople did what they wanted to do." (Kessie Dep. 336:9-12.)

Following the accident, Whinery prepared an accident report. (Whinery Dep. 98:2-6.) In the report, Whinery confirmed "that there was no failure of the element of the swing itself. . . ." (Whinery Dep. 99:11-15; Crow Decl. Ex. 5.) Testifying regarding the accident report, Whinery confirmed that it was his opinion the accident was caused by "human error between Tyler and Robin."[2] (Whinery Dep. 100:3-5.)

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The

---

[2]  The Court denies as moot Almquist's request to strike portions of Whinery's deposition testimony. (Pl.'s Opp'n 2-3.) The Court does not rely on the challenged testimony to resolve the present motions.

party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All material facts are resolved in a light most favorable to the nonmoving party. *Id*. at 331. The court must accept all evidence and make all inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).

## DISCUSSION

### I.      Almquist's Negligence Claim Against Synergo

In her first cause of action, Almquist alleges a negligence claim against Synergo for breaching its "duty to act as a reasonable challenge course inspector under the circumstances." (Am. Compl. ¶ 29.) Specifically, Almquist contends that Synergo was required to "either direct or at least recommend that [the Bar-M-Ranch] close the Giant Swing until operators of the swing had been properly trained." (Am. Compl. ¶ 29.) Synergo moves for summary judgment on Almquist's negligence claim, on the grounds that Synergo performed its inspections as a reasonable course inspector and, in any event, Synergo's inspection did not create a foreseeable risk of harm. (Def.'s Mot. Summ. J. 17, 26.) Synergo maintains that the only duty it owed to Almquist was "the common law duty not to create a foreseeable, unreasonable risk of harm." (Def.'s Mot. Summ. J. 15.) Synergo insists that its duty was "defined by the scope of the agreement between" Synergo and the Bar-M-Ranch. Synergo further argues that because Almquist was not in privity with the contract between Synergo and the Bar-M-Ranch, Synergo's only duty to Almquist was to act reasonably in light of the foreseeable risks of harm. Synergo contends that it owed no expanded duties to Almquist, and that at all times it acted as a reasonable course inspector.

///

Page 9 - FINDINGS AND RECOMMENDATION

In response, Almquist contends that Synergo should have shut down the Giant Swing in May 2013, because it had knowledge that the "Bar-M-Ranch facilitators were not properly trained and knew that they were using a faulty process for hooking users to the giant swing . . . ." (Pl.'s Opp'n 21, 24-25.) Almquist alleges that Synergo's failure to act as a reasonable course inspector caused her injuries. (Pl.'s Opp'n 21, 24-25.) Almquist contends that Synergo owed her a duty of care, independent of its contract with the Bar-M-Ranch, to protect her from the known risk created by the Bar-M-Ranch when it allowed inadequately-trained individuals to operate the Giant Swing.

In support of her theory that Synergo owed her an expanded duty of care, Almquist relies on the Oregon's Supreme Court's decisions in *Fazzolari v. Portland Sch. Dist. 1J*, 303 Or.1 (1986) and *Fuhrer v. Gearhart-By-The-Sea, Inc.* 306 Or. 434 (1988), the rescue doctrine articulated in the Restatement (Second) of Torts, and the reasoning in *Bixby v. KBR, Inc.*, 893 F. Supp. 2d 1067 (D. Or. 2012).

### A.    Synergo's Liability Under *Fazzolari* and *Fuhrer*

In *Fazzolari*, the Oregon Supreme Court "introduced a general 'foreseeability' formula to replace traditional concepts of duty, breach, and causation, as those concepts were used in negligence cases."[3] *Waldner v. Stephens*, 345 Or. 526, 535 n.9 (2008). The Oregon Supreme Court explained in *Fazzolari* that absent a special relationship, negligence liability depends on whether the conduct unreasonably created a foreseeable risk of harm:

> [U]nless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from defendant's conduct properly depends on whether the conduct

---

[3]  Oregon law governs Almquist's negligence claims. *Maricopa Cty. of State of Arizona v. Maberry*, 555 F.2d 207, 210 (9th Cir. 1977) ("It is hornbook law that a federal court in a diversity case must follow the substantive law of the state where the incident occurred.").

unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff.

303 Or. at 17.

Thus, in the absence of a special relationship, the court need only consider "whether the defendant's conduct resulted in a foreseeable and unreasonable risk of harm of the kind that the plaintiff suffered." *Towe v. Sacagawea*, 357 Or. 74, 86 (2015). "The role of the court is what it ordinarily is in cases involving the evaluation of particular situations under broad and imprecise standards: to determine whether upon the facts alleged or the evidence presented no reasonable factfinder could decide one or more elements of liability for one or the other party." *Fazzolari*, 303 Or. at 17.

Almquist asserts that Synergo knew the "Bar-M-Ranch did not have a policies and procedure manual for the Giant Swing," that the "Bar M Ranch facilitators for the Giant Swing were not properly trained," and that the "Bar-M-Ranch was using a method of hooking up the life-line and the haul-line that put the users' safety at risk." (Pl.'s Opp'n 28; *see also* Vowels Dep. 42:10-18 ("I said you never do that, don't do that, there's a possibility of a problem with that.").) Almquist contends that Synergo's knowledge of these unreasonable risks required Synergo to direct, or at least recommend, that the Bar-M-Ranch shut down its Giant Swing. Almquist relies on the Oregon Supreme Court's decisions in *Fazzolari* and *Fuhrer* in support of her theory that Synergo was negligent even if it did not create the underlying risk of harm. *See Fazzolari*, 303 Or. at 20 ("The scope of this obligation does not exclude precautions against risks of crime or torts merely because a third person inflicts the injury."); *Fuhrer*, 306 Or. at 438 ("In a warning case, the risk of harm created is exposure to a danger known to the defendant.").

As an initial matter, the parties appear to agree, and the Court finds, that Synergo did nothing to *create* the risk of harm that injured Almquist. Nevertheless, in *Fuhrer*, the Oregon Supreme Court instructed that whether a defendant created the dangerous condition did "not bear on whether defendant[] unreasonably failed to warn or protect others who were at risk." *Id*. In *Fuhrer*, the Oregon Supreme Court held that a defendant may be liable "if the defendant can reasonably foresee that there is an unreasonable risk of harm, a reasonable person in defendant's position would warn of the risk, the defendant has a reasonable chance to warn of the risk, the defendant does not warn of the risk, and the plaintiff is injured as a result of the failure to warn." *Id.* at 438-39. The Oregon Supreme Court outlined "four factors to be considered in determining whether action or a failure to act is reasonable: the likelihood of harm, the severity of the possible harm, the 'cost' of action that would prevent harm, and the defendant's position, including the defendant's relationship with the plaintiff." *Id*. at 439.

Synergo seeks to distinguish *Fuhrer* on the ground that this is not a "failure to warn" case. Indeed, Almquist has not alleged that Synergo was negligent by failing to warn her about the risks of using the Giant Swing without properly-trained facilitators. Rather, Almquist alleges that Synergo was negligent because it failed to direct, or at least recommend, that the Bar-M-Ranch shut down the Giant Swing. In *Fuhrer*, the Oregon Supreme Court noted that "[t]he failure to provide safety measures is measured by the same standard as the standard used for failure to warn," that "[o]ne factor in determining the reasonableness of any failure to warn or act is the opportunity and cost of warning or taking action," and that "[n]ormally, providing safety measures is more costly, and the cost may make a failure to act reasonable when a failure to warn would not be reasonable; otherwise,

the analysis of the two situations should be no different." *Id.* at 442 n.3. Thus, although Almquist has not alleged a failure to warn, the *Fuhrer* analysis is nevertheless relevant here.

Consistent with *Fazzolari* and *Fuhrer*, Synergo's liability for failing to insist that the Bar-M-Ranch shut down its Giant Swing is determined by considering whether Synergo could have reasonably foreseen that there was an unreasonable risk of harm, a reasonable challenge course inspector would have shut down the Giant Swing, Synergo had a reasonable chance to shut down the Giant Swing, and Almquist was injured as a result of Synergo's failure to shut down the Giant Swing.

Based on the undisputed facts in the record, Almquist cannot satisfy the required elements of a negligence claim against Synergo. Even if Almquist could establish that Synergo could have reasonably foreseen the unreasonable risk of harm that injured Almquist and that closing the Giant Swing would have prevented Almquist's accident, Almquist cannot establish that a reasonable course inspector would have (or could have) shut down the Giant Swing or that Synergo had a reasonable opportunity to do so.

It is undisputed that the Bar-M-Ranch, not Synergo, exercised exclusive management, supervision, oversight, and control over the Giant Swing and its users. Thus, Synergo did not have authority to shut down operation of the Giant Swing. (Jennifer L. Crow Decl. Ex. 1 (Steven R. Gustafson Dep. 178:9-12, Sep. 29, 2016 (hereinafter "Gustafson Dep.")), Oct. 4, 2016) ("Q. But that would not be enforceable on Matt Kessie or the Calvary Church, because he had no authority to shut them down, correct? A. Yes.").)

Almquist alleges in the alternative that Synergo could have recommended that the Bar-M-Ranch shut down the Giant Swing, but Synergo had already recommended that Bar-M-Ranch create

a policies and procedure manual for the Giant Swing, cautioned that the method Kessie used to secure individuals to the Giant Swing was improper, recommended that all staff should be properly trained and supervised, and repeatedly urged Kessie to schedule a facilitator training session. The Bar-M-Ranch took no meaningful action in response to Synergo's recommendations, underscoring Synergo's lack of authority over operation of the Giant Swing and undermining any representation in hindsight that the Bar-M-Ranch would have shut down the Giant Swing had Synergo so recommended. (Gustafson Dep. 187:10-16) (acknowledging that there is no way to know if the Bar-M-Ranch would have shut down the Giant Swing in response to a recommendation from Synergo, noting that the Bar-M-Ranch had ignored prior Synergo recommendations).)

The record before the Court demonstrates that Synergo inspected the physical apparatus of the Giant Swing in accordance with the terms of its agreement with the Bar-M-Ranch, and that Synergo went above and beyond the physical inspection by advising Bar-M-Ranch personnel of the need for a policy and procedures manual, by highlighting the importance of training for its facilitators, and by specifically warning Kessie about his improper attachment procedure for the Giant Swing. It was the responsibility of the Bar-M-Ranch–not Synergo–to implement Synergo's recommended safety measures. Almquist's theory that Synergo was required to act more forcefully to attempt to shut down the Giant Swing would require a jury to find that Synergo should have acted extraordinarily, not reasonably.[4] Indeed, it would be a fundamentally unfair application of negligence law to hold Synergo liable here, where it warned the Bar-M-Ranch of known safety risks, but the

---

[4] Based on the Court's holding, the testimony of Almquist's expert, Steven Gustafson, that Synergo should have acted more forcefully, does not created a disputed issue of material fact, especially in light of Gustafson's subsequent deposition testimony that any more forceful language would be outside the scope of a typical annual inspection. (Def.'s Reply 8.)

Bar-M-Ranch continued operating the Giant Swing despite Synergo's warnings. Not surprisingly, Almquist has not cited any Oregon case to support a theory of negligence liability for a defendant who failed to implement safety measures absent any relationship with, or control over, the injured party. *Compare Fazzolari*, 303 Or. at 20 (defendant was a school and the injured plaintiff was a student); *Fuhrer*, 306 Or. at 441 (defendant was an innkeeper and injured plaintiff was a guest).

Viewing the evidence in a light most favorable to Almquist, the undisputed evidence demonstrates that Synergo acted as a reasonable challenge course inspector, and no reasonable juror could find Synergo liable for negligence.

### B.    Synergo's Liability under the Restatement (Second) of Torts § 323

Almquist also contends that Synergo is culpable under "the rescue doctrine, as articulated under the Restatement (Second) of Torts" and the Oregon Court of Appeals decision in *Peterson v. Multnomah Cty. Sch. Dist. No. 1*, 64 Or. App. 81 (1983). (Pl's Brief 29.) Almquist argues that once Synergo "undertook to inspect" the Giant Swing, it "had a duty to do so reasonably." (Pl.'s Opp'n 31.) According to Almquist, "it was unreasonable for Synergo not to issue a 'do not operate notice' to Bar-M-Ranch." (Pl.'s Opp'n 31 (citing Steven Gustafson Decl. ¶ 27, July 19, 2016).) The Court disagrees.

The Restatement (Second) of Torts § 323 provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking if,

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (1965); *see also Peterson*, 64 Or. App. at 94 ("[O]nce the duty is undertaken it can be breached by a negligent *failure* to perform, as well as by negligent performance.") (emphasis in original).

Section 323 addresses a defendant's liability to the party for whom it provided services. The plain language of § 323 requires that defendant's negligence must either increase the risk of harm to *that* person, or induce reliance as a result of the actions. *See Scheffel v Oregon Beta Chapter of Phi Kappa Psi Fraternity*, 273 Or. App. 390, 426 (2015) (holding that *Peterson* does not stand "for the proposition that a duty 'to another' assumed under *Restatement* section 323 also covers liability for injuries sustained by a third party, such as the student athlete in *Peterson*"). Even assuming Synergo could have forced the Bar-M-Ranch to shut down the Giant Swing, its failure to do so cannot give rise to a third party's § 323 claim.[5] Accordingly, Almquist cannot sustain a claim for negligence under the Restatement (Second) of Torts § 323.

## C.    Synergo's Liability under *Bixby* and the Restatement (Second) of Torts § 324A

Almquist also argues that under the Restatement (Second) of Torts § 324A and the *Bixby* decision, any duty Synergo owed to the Bar-M-Ranch must extend to her because the Bar-M-Ranch authorized Synergo to exercise independent judgment on behalf of Bar-M-Ranch when it asked Synergo to inspect the Giant Swing. (Pl.'s Opp'n 31-36.) Almquist's theory of liability is not supported by the record.

///

///

---

[5] In addition, there is no evidence that Synergo's conduct "increase[d] the risk" to Almquist, or that the Bar-M-Ranch relied on Synergo's inspection to the detriment of Almquist. Restatement (Second) of Torts § 323.

Page 16 - FINDINGS AND RECOMMENDATION

The Restatement (Second) of Torts § 324A provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965).

As an initial matter, for the reasons discussed above, Almquist cannot demonstrate that Synergo failed to exercise reasonable care and therefore Almquist's negligence claim, under any theory, must fail. In any event, the Restatement (Second) of Torts § 324A and the *Bixby* decision do not support Almquist's negligence claim.

In *Bixby,* the court considered whether plaintiffs, who were not parties to a contract between a defendant contractor and the Army Corps of Engineers (the "Corps"), could bring an action against the defendant contractor based upon its negligent performance of the contract.[6] *Bixby*, 893 F. Supp. 2d at 1091 (courts should consider "whether some third-party may bring suit based on this [special] relationship" based on duties set forth in the contract). The *Bixby* court concluded that under the terms of the contract, the defense contractor owed a duty of care to third parties to establish a health and safety program based upon applicable requirements from the Occupational Safety and Health Administration. *Id*. at 1094-96 ("Consequently, [defendant contractor] may be liable to the [third-

---

[6] Of note, the court in *Bixby* also found that the parties to the contract were "in a special relationship that gave rise to a duty of care independent of the terms of the contract." 893 F. Supp. 2d at 1091.

parties] 'for physical harm resulting from [the] failure to exercise reasonable care' in connection with carrying out its responsibilities under [the contract]." (quoting Restatement (Second) of Torts § 324A (1965))). The *Bixby* court held that the question of whether the defense contractor owed a duty to third parties turned on the terms of the contract. *Id* at 1090-91; *see also Jones v. Emerald Pac. Homes, Inc.*, 188 Or. App. 471, 478 (2003) (holding that "parties to a contract are in a 'special relationship' imposing a 'heightened duty of care' and thereby creating potential tort liability when one party delegates to the other the authority to make important decisions with the understanding that the authority is to be exercised on behalf of and for the benefit of the authorizer").

With regard to the agreement between Synergo and the Bar-M-Ranch, the Bar-M-Ranch hired Synergo in 2012 and 2013 to perform an annual "Challenge Course Inspection." (Marter Decl. Exs. 1 and 2; *see also* Kessie Dep. 110:15-19 ("[T]he people that were coming to inspect the course were inspecting the safety of the elements . . . the safety of the equipment."); Kessie Dep. 165:20-22 ("[W]e were inspecting the physical elements of the course to make sure it was safe."); Kessie Dep. 170:20-21 ("Again, my idea was that this is an element inspection[.]").) It is undisputed that there was no written agreement between the parties. Kessie simply called Synergo and scheduled the inspection. (Kessie Dep. 125:9 ("I just called Synergo. I don't remember who I talked to. We just ordered up an inspection.").) Following each inspection, the Synergo inspector prepared a written report, including a detailed statement on the items included for inspection. Relevant here, the reports expressly stated that Synergo did not evaluate "[f]acilitation techniques." (Marter Decl. Ex. 1 at 2, Ex. 2 at 2.) Indeed, Kessie testified that he was not expecting Synergo to assess his facilitation techniques. (Kessie Dep. 175:16-176:4.)

Thus, under the plain language of the inspection report, Synergo performed only an equipment inspection. There was no agreement between Synergo and the Bar-M-Ranch that required or anticipated that Synergo inspect or review training or facilitation techniques. *Compare Bixby*, 893 F. Supp. 2d at 1091 (finding that the contract "authorized KBR to 'exercise independent judgment,' on the Army's behalf"). Even if the Bar-M-Ranch delegated its authority to Synergo to keep Giant Swing users safe,[7] it only delegated authority to inspect the Giant Swing equipment, not to evaluate the Bar-M-Ranch's training of operators or facilitation of the Giant Swing.

Based on the record, the Court concludes that Synergo "contracted" only to inspect the physical elements of the Giant Swing, and that the Bar-M-Ranch, by contract or otherwise, never authorized Synergo to exercise its independent judgment beyond the specific duties set forth in its annual inspection reports. Almquist has not alleged that Synergo failed to exercise reasonable care in performing its physical inspection of the Giant Swing. Rather, Almquist argues that Synergo failed to act beyond the terms of its inspection agreement with the Bar-M-Ranch and assume obligations that were expressly excluded by the inspection report. Neither *Bixby* nor § 324A support Almquist's theory of liability.

For the reasons discussed above, Almquist is unable to sustain a negligence claim against Synergo under any theory. Accordingly, the district judge should grant Synergo's motion for summary judgment.

---

[7] The record does not support Almquist's claim that because the Bar-M-Ranch is not "in the business of challenge courses," it was unable "to fully understand and recognize the risks to users of the swing that existed as a result of its failure to have a policies and procedures manual and its failure to properly train its facilitators." (Pl.'s Opp'n 33.) The record is clear that Kessie had previous experience with challenge courses and fully understood the risks associated with the Giant Swing. Kessie testified regarding his understanding that he was only contracting for a structural course inspection, and that he knew he could have sought outside assistance for training and facilitation.

## II.        Almquist's Negligence Claim Against ACCT

In her second cause of action, Almquist alleges that ACCT established standards for the challenge course industry and then induced its members, including Synergo, to adopt those standards. (Am. Compl. ¶ 30.) Almquist contends that "ACCT's standards were negligently conceived, formulated, and tested," and Synergo's reliance on ACCT's defective standards caused Almquist's injuries. (Am. Compl. ¶ 30.)

ACCT has moved for summary judgment on the ground that there is no evidence of a causal relationship between ACCT's voluntary standards and Almquist's accident. (Def.'s Mot. Summ. J. 9.) Alternatively, ACCT argues that its promulgation of voluntary standards for challenge courses did not create a duty to the public generally, or Almquist specifically. (Def.'s Mot. Summ. J. 12.) The Court agrees that the district judge should enter summary judgment in favor of ACCT.

### A.        No Causal Connection

ACCT argues that "the undisputed evidence shows that the people who were actually in charge of the Giant Swing never saw [ACCT's standards] or relied on [ACCT's standards] in any way." (Def.'s Mot. Summ. J. 10 (emphasis omitted).) As such, ACCT contends that its standards bear no causal relationship to Almquist's accident. (Def.'s Mot. Summ. J. 10.)

In response, Almquist argues there was a "direct causal relationship" between ACCT's standards and her injuries. (Pl.'s Opp'n 13.) Specifically, Almquist maintains that if ACCT standards had required an inspector to close an element once the inspector was aware of a safety risk, Synergo would have followed that requirement and ordered the Giant Swing to be closed, thereby preventing Almquist's accident. (Pl.'s Opp'n 13-14.)

In Oregon, a plaintiff must establish a causal connection between the allegedly negligent action and the injury. *See Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or. 329, 340 (2004) ("A plaintiff, of course, still must prove 'factual' or 'but-for' causation – that there is a causal link between the defendant's conduct and the plaintiff's harm. . . ."); *see also Sloan v. Providence Health Sys.*, 282 Or. App. 301, 311 (2016) ("First, a plaintiff must establish that defendant's negligence was a cause in fact of the alleged injury."). It is the plaintiff's burden to present evidence that defendant's conduct was the "but-for" cause of the plaintiff's harm or, in the case of multiple potential causes, that it was a "substantial factor" in bringing about the harm. *Joshi v. Providence Health Sys.*, 342 Or. 152, 161-62 (2006).

The Court concludes that Almquist cannot establish that ACCT's standards were the cause in fact of her accident. Almquist maintains that her accident would have been prevented had ACCT promulgated a standard that required inspectors to inform owners that an element may not be used until a known danger was remedied. Almquist's theory of liability is too attenuated. First, Almquist's theory ignores that ACCT's standards are voluntary and unenforceable. Thus, even if ACCT had promulgated a certain standard, ACCT could not have compelled Synergo to adhere to the standard. In any event, Almquist's causation theory also relies upon a series of events that may or may not have happened even if ACCT had promulgated the standard Almquist seeks: (1) Synergo would have complied with the standard and recommended closure of the Giant Swing, despite already expressly warning Kessie of the known risks; (2) Kessie would have complied and shut down the Giant Swing, and (3) all of the Bar-M-Ranch personnel, including Tidrick, would have been informed of the closure *and* heeded the closure. Based on the fact that Bar-M-Ranch ignored Synergo's safety recommendations and that Tidrick ignored protocol and allowed an untrained volunteer to operate

Page 21 - FINDINGS AND RECOMMENDATION

the Giant Swing, it is unlikely that the ACCT standard Almquist seeks would have prevented the accident.

Furthermore, Almquist's theory is based on her allegation that ACCT standards should require that the inspector "recommend that equipment be closed if the operators of the equipment are not properly trained and remain closed until the operators of the equipment have been properly trained." (Am. Compl. ¶ 26.) Whether or not the trained operators of the Giant Swing were properly trained, Almquist's accident was caused by an untrained volunteer, not one of the facilitators trained and approved by Kessie. Thus, even if ACCT had promulgated the standard Almquist seeks, *and* Synergo had followed it, *and* Synergo had the authority to close the Giant Swing pending proper training, *and* the Bar-M-Ranch had closed the Giant Swing, the accident likely would not have been prevented because the accident occurred as the result of unauthorized use on a day that the Giant Swing was closed.

Almquist seeks to reduce the causal connection requirement to a series of "what ifs." That is not the law in Oregon. *See Griffin v. K.E. McKay's Mkt. of Coos Bay Inc.*, 125 Or. App. 448, 452 (1993) ("A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant."). ACCT's standards were neither the "but for" cause of, nor a substantial factor in, Almquist's tragic accident.

Viewing the evidence in a light most favorable to Almquist, no reasonable juror could return a verdict in her favor on the issue of a causal connection between ACCT's voluntary standards and the accident. Accordingly, the district judge should grant ACCT's motion for summary judgment. ///

Page 22 - FINDINGS AND RECOMMENDATION

## CONCLUSION

For the reasons set forth above, the district judge should GRANT Synergo's Motion for Summary Judgment (ECF No. 56), and GRANT ACCT's Motion for Summary Judgment (ECF No. 64.).

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 27th day of December 2016.

_____
STACIE F. BECKERMAN
United States Magistrate Judge